1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11   KENNETH L. HURST,                )
                                      )
12                   Plaintiff,       )
                                      )      No.  CV-05-862-HU
13        v.                          )
                                      )
14   JOANNE B. BARNHART,              )
     Commissioner of Social           )      OPINION & ORDER
15   Security,                        )
                                      )
16                   Defendant.       )
     ─────────────────────────────────)
17
     Jason D. Hayward
18   DAVIS, ADAMS, FREUDENBERG, DAY & GALLI
     600 NW Fifth Street
19   Grants Pass, Oregon 97526-2024

20        Attorney for Plaintiff

21   Karin J. Immergut
     UNITED STATES ATTORNEY
22   District of Oregon
     Neil J. Evans
23   ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
24   Portland, Oregon 97204-2902

25   Jeffrey Baird
     SPECIAL ASSISTANT UNITED STATES ATTORNEY
26   Social Security Administration
     701 5th Avenue, Suite 2900 M/S 901
27   Seattle, Washington 98104-7075

28        Attorneys for Defendant


1 - OPINION & ORDER

HUBEL, Magistrate Judge:

Plaintiff Kenneth Hurst brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction under 42 U.S.C. § 405(g). Both parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c).

For the reasons set forth below, the Commissioner's decision is affirmed.

PROCEDURAL HISTORY

Plaintiff applied for DIB on September 29, 2003. Tr. 52-60. His application was denied initially and on reconsideration. Tr. 44-49, 40-42.

On December 8, 2004, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 321-64. In a March 25, 2005 decision, the ALJ found plaintiff not disabled. Tr. 9-18. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 4-6.

FACTUAL BACKGROUND

Plaintiff alleges disability, commencing December 31, 2001, based on headaches, degenerative joint disease in his knees and shoulders, and degenerative disk disease in his back and neck. Tr. 52, 324. He also notes a history of panic attacks. Tr. 338.

At the time of the hearing, plaintiff was forty-nine years old. Tr. 324. He is a high school graduate. Id. His past relevant work is as a boatswain's mate and deckhand. Tr. 18.

I. Medical Evidence

The medical evidence begins with plaintiff's treatment with

2 - OPINION & ORDER

Dr. Thuy Trang Dang, M.D., at the Veteran's Administration (VA) in Sacramento, California.  Tr. 187-89.  Plaintiff's initial visit with Dr. Dang was in March 2001 where he described a twenty-five year history of chronic headaches, tracing back to a 1978 motor vehicle accident which caused an intracranial hematoma for which he underwent a craniotomy and the insertion of a plastic plate in the right temporal area.  Tr. 187.

Plaintiff told Dr. Dang that his primary concern was his headaches, which he described as usually bitemporal and located behind the eyes and the back of the neck.  Tr. 188.  Plaintiff explained that over the previous ten years, he had constant headaches, with no day free of headache.  Id.  He stated that resting and Vicodin, helped and that moving around and physical activity exacerbated his pain.  Id.

Dr. Dang noted plaintiff's history of panic disorder, left lateral epicondylitis, left knee degenerative joint disease, and a left clavicle fracture.  Tr. 188, 189.  He noted that plaintiff's military record review showed previous neurology treatment for headaches, including prescriptions for Motrin, Elavil, Fiorinol, Inderal, Midrin, and Prozac.  Tr. 189.  Dr. Dang also noted plaintiff's report of daily marijuana use to help his headaches.  Tr. 188.

Dr. Dang refilled plaintiff's Vicodin for headache pain, for one month, and Xanax, for his anxiety disorder, for one month.  Tr. 189.

In an April 3, 2001 visit with Dr. Dang, plaintiff reported that he had been treated for panic/anxiety attacks for fifteen years with Xanax.  Tr. 187.  Plaintiff stated that whenever he

3 - OPINION & ORDER

drives on a freeway, he needs the medication. <u>Id.</u>    Dr. Dang assessed plaintiff as suffering from chronic headaches, for which he continued plaintiff on Vicodin, and referred him to a psychology consultation for the panic and anxiety. <u>Id.</u>

Plaintiff underwent a mental health assessment by Debra Nathanson, MSW, on April 17, 2001. Tr. 183-85. He reported his history of anxiety going back to a 1991 non-injury motor vehicle accident. Tr. 184. He described being able to drive to work while on Xanax, but not being able to get in the car otherwise. <u>Id.</u> He also complained of anxiety in crowds. <u>Id.</u>

Plaintiff reported smoking marijuana for pain control. <u>Id.</u> He also reported that he and his wife were selling their home and would begin moving to Oregon in January 2002 where they owned property and intended to build a home. <u>Id.</u> They were waiting for their sixteen year old to finish school. <u>Id.</u> At the time, plaintiff worked in dock and harbor maintenance four days per week. <u>Id.</u>    He complained of having limited enjoyment and abilities because of his severe post-exertion headaches. Tr. 185.

Plaintiff saw Nathanson again on May 15, 2001, when he described "classic panic attacks," often related to driving on the freeway. Tr. 181. He also related feeling vulnerable in crowds, which he indicated had increased in the previous two to three years. <u>Id.</u>    Nathanson diagnosed him with "specific phobia-situational type," along with "r/o panic do with agoraphobia." <u>Id.</u> She also noted his cannabis use. <u>Id.</u>

On June 12, 2001, plaintiff was seen by VA psychiatrist Dr. Rita Hargrave. Tr. 177-80. Dr. Hargrave noted plaintiff's history and daily marijuana use. Tr. 177, 178. Dr. Hargrave diagnosed

4 - OPINION & ORDER

plaintiff as suffering from generalized anxiety disorder with agoraphobia, with schizoid and dependent personality features. Tr. 178. She prescribed BuSpar, an anti-anxiety medication, and urged him to reduce and eliminate caffeine. Tr. 178.

In early July 2001, in a visit with Nathanson, plaintiff reported that the BuSpar was working well. Tr. 175. He stated that he had a decrease in panic while driving and less stomach problems. Tr. 174. He felt less anxious in general. Id. He planned to retire in December and move to Oregon. Id.

On July 3, 2001, plaintiff had an assessment by neurologist Dr. Frah Rana, M.D. Tr. 172-73. He reported taking four Vicodin per day on the four days per week that he worked. Tr. 173. Dr. Rana assessed plaintiff as having "mixed" headaches. Id. Some seemed to be migraines and others most likely were musculoskeletal. Id. Dr. Rana noted the possibility of rebound headaches from the frequent Vicodin use. Id. He advised plaintiff to stop taking Vicodin and started him on Depakote, with Fioricet as needed. Id.

On July 19, 2001, plaintiff told Dr. Rana that although he had no difficulty tolerating the Depakote, he had no improvement in his headache pain. Tr. 173. Dr. Rana increased the Depakote dose. Id.

Also on July 3, 2001, plaintiff saw Dr. Dang to follow up on his complaints of abdominal and joint pain. Plaintiff reported that his abdominal pain was better since he stopped taking Excedrin and began taking ranitidine regularly. Tr. 172. He complained, however, of multiple joint pain, particularly in his left shoulder, fingers, and left hip. Id. He had a normal physical examination and his x-rays taken that date showed a normal left hip, normal

5 - OPINION & ORDER

lumbosacral spine, and normal hands.   Tr. 190-92.   Dr. Dang indicated that plaintiff may have osteoarthritis, but he noted that plaintiff did not want to be on medication at this point and just wanted documentation.   Tr. 172.

In addition to seeing Dr. Rana and Dr. Dang on July 3, 2001, plaintiff also met with Reenie Davison of the VA's mental health department.   Tr. 169-70.   She taught him how to do relaxation breathing.

On August 9, 2001, plaintiff met with Nathanson and Davison and was examined by Dr. Hargrave.   Tr. 165-69.   He reported to Nathanson that his stomach pain, anxiety, and stress had decreased and that he had been less angry.   Tr. 169.   He also reported an increase in headaches.   Id.   At 10:05 a.m., he reported to Dr. Hargrave that his panic attacks were not quite as severe as they had been and were less frequent.   Tr. 166.   He had returned to driving on the freeway.   Id.   At 10:49 a.m., however, he reported to Davison that he had experienced an increase in panic while driving.   Tr. 165.   Davison noted that she wanted to treat him with behaviorial interventions.   Id.

On September 6, 2001, plaintiff saw Davison again and complained of an increase in panic attacks.   Id.   Davison treated him with cognitive behavioral interventions.   Tr. 165.   She used in vivo desensitization with the Antioch Bridge, one of plaintiff's strong anxiety/panic triggers.   Id.   She ran plaintiff through the same scenario three times, with a decrease in symptom intensity. Id.

On September 14, 2001, plaintiff reported to Davison that he had had no significant panic attacks since his last visit.   Tr.

6 - OPINION & ORDER

1   165.  Dr. Dang also noted on October 11, 2001, that plaintiff's

2   panic disorder was under control.  Tr. 163.

3       Before moving to Oregon at the end of the year, plaintiff saw

4   Davison for at least one additional visit on October 23, 2001.  Tr.

5   161.  He reported an increase in panic symptoms while on the

6   freeway.  Id.  Davison indicated that she would redo the

7   desensitization therapy on November 2, 2001, but there is no chart

8   note in the record of a visit with her on that date.  Plaintiff did

9   see Dr. Hargrave on November 30, 2001, and reported that his

10  anxiety and agoraphobia had improved.  Tr. 159.

11      In an April 8, 2002 summary of his mental health treatment at

12  the Sacramento VA, Nathanson noted that plaintiff had completed

13  relaxation and stress management treatment with Davison with a good

14  response.  Tr. 157.  She indicated that medication had helped

15  reduce his symptoms and that he learned and used other techniques

16  from Davison to help with his panic attacks.  Id.  His final

17  diagnosis of panic attacks was the same as his admission diagnosis

18  but his Global Assessment of Functioning (GAF) score had improved

19  from 63 on admission to 75.  Id.

20      Before plaintiff moved to Oregon at the end of 2001 or early

21  2002, he saw Dr. Dang in October 2001 and reported that he was

22  happy with the results he was achieving from the biofeedback in

23  regard to his panic attacks.  Tr. 162.  Dr. Dang noted that

24  plaintiff's gastroesophageal reflux disease (GERD) was controlled

25  by the ranitidine.  Id.  He also noted that plaintiff was in the

26  process of moving to Oregon to five acres of land.  Tr. 163.

27      Plaintiff's last visit with Dr. Rana was on January 20, 2002,

28  where he reported that the larger dose of Depakote had not improved

7 - OPINION & ORDER

his headaches and was creating gas. Tr. 158. Dr. Rana discontinued the Depakote and started plaintiff on Pamelor. Id.

In April 2002, plaintiff started care at the VA in White City, Oregon. Tr. 205-44. His primary care provider was Dr. William Allen, D.O., whom he saw regularly up to the time of his hearing before the ALJ. Id. During the more than two years that he obtained care from Dr. Allen, plaintiff complained of continuing headache pain, shoulder pain, and some continuing GERD symptoms. Id.

Plaintiff's headaches were an ongoing basis for treatment with Dr. Allen. He also had an assessment at the VA's Headache Clinic in Portland with Dr. Kusum Kumar, M.D. Tr. 202-04. At various times, he reported headache pain levels of 5/10 (June 27, 2002; Tr. 233), 6/10 (October 29, 2002; Tr. 230), 3-7/10 (February 5, 2003; Tr. 223), 3-4/10 and 8/10 (June 19, 2003; Tr. 202). He also reported daily headaches, worsening with activity, and that the pain was increasing as he aged. Tr. 202, 227, 256. He was treated with Fiorinol, Neurontin, Topomax, Vicodin, tizanidine, and morphine. Tr. 208, 215, 221, 222, 253.

Dr. Kumar at the VA Headache Clinic recommended that plaintiff try tizanidine which Dr. Allen then prescribed in early September 2003. Tr. 208. At the end of that month, plaintiff reported that it was not helping his headache at all. Tr. 206, 207. Dr. Allen then increased the dose. Tr. 206.

On January 13, 2004, plaintiff reported that he had tried a several-week medication free period, but that did not help his headaches. Tr. 252. He explained that the headaches did not awaken him and were tolerable when he was prone. Id. Dr. Allen

8 - OPINION & ORDER

reviewed a pain management contract with plaintiff and started prescribing morphine. Tr. 252-55. On January 28, 2004, plaintiff reported to the nurse that the morphine did "round his headaches off a bit" but did not completely resolve the pain. Tr. 251. He noted again in May 2004 that the pain medications helped a little bit and his headaches were better if he did not do any work. Tr. 249-50. He described the morphine helping "some." Tr. 250. On May 7, 2004, Dr. Allen remarked that plaintiff was doing better with the longer acting narcotic than he was on Vicodin. Tr. 248. Dr. Allen also remarked that plaintiff had to repair his deck recently and that plaintiff complained that his chronic headache got worse while working. Id.

Dr. Allen increased the morphine dosage on June 1, 2004, in response to plaintiff's complaint that it was not helping. Tr. 295. In late August 2004, a nursing note indicates that the morphine was helpful and brought plaintiff's pain to a level 2. Tr. 294.

On November 12, 2004, plaintiff called to report an increase in headache pain. He had recently started taking Celexa, an anti-depressant medication, and the nurse questioned whether the new drug was impacting the headache pain. Tr. 287. Dr. Allen recommended taking Advil with the morphine and requested that plaintiff report back the following week if that proved to be ineffective. Id. On November 24, 2004, plaintiff complained of more frequent and painful headaches. Tr. 307. Dr. Allen noted that plaintiff reported increasing headache pain over the past month. Tr. 305. He did not believe it was caused by the Celexa. Id. He noted that the morphine seemed to help for an hour or two,

9 - OPINION & ORDER

and that the headaches generally were worse when plaintiff was up and working and better when he was prone. Id. He indicated that it was alright if plaintiff increased his morphine dose and indicated that he would prescribe Elavil, an anti-depressant medication also used to treat chronic pain, as well. Id.

While Dr. Allen treated plaintiff's headache pain, he also treated plaintiff for shoulder pain and GERD, and occasionally mentioned his anxiety/panic disorder. In early February 2003, plaintiff reported to Dr. Allen that he had pain in both shoulders. Tr. 221. Shoulder x-rays performed the next day showed some minimal inferior osteophyte formation in the acromioclavicular joint in the right shoulder, and in the left shoulder, an old ununited fracture of the distal clavicle with hypertrophic bone formation along the inferior margin. Tr. 316. The x-ray report stated that the left shoulder problem could be causing some impingement. Id.

Plaintiff began treating with occupational therapy for the shoulder pain on February 20, 2003. Tr. 218-20. He was given home stretching exercises. Tr. 220. On March 17, 2003, plaintiff reported that the exercise program was going well and that he had very little pain, with a reduction of a pain level from 6/10 to 2/10. Tr. 215. He cancelled a pending orthopedic appointment. Id. On May 15, 2003, plaintiff reported continued improvement to the occupational therapist and noted that his activity levels had increased dramatically. Tr. 214. He told the occupational therapist that he had spent a number of "'6hr days' climbing and pruning trees and weed eating property." Id. No subsequent progress notes appear to mention any continued shoulder pain.

As for plaintiff's GERD, Dr. Allen noted on September 2, 2003, that plaintiff was experiencing some GERD symptoms, resulting in his recommendation to restart ranitidine. Tr. 208. On January 13, 2004, Dr. Allen noted that plaintiff's gastrointestinal (GI) system was "OK."   Tr. 253.   On May 7, 2004, Dr. Allen noted that plaintiff's GI system was "OK" with metamucil. Tr. 248.  He also stated that the GERD was well controlled with Zantac as needed. Tr. 249.

However, on September 15, 2004, plaintiff called to report continuing stomach pain. Tr. 290. Dr. Allen recommended Prilosec and ordered an upper GI x-ray series. Id. On October 19, 2004, the GI x-rays were taken and showed a small amount of gastroesophageal reflux. Tr. 315. On October 21, 2004, Dr. Allen approved an increase in Prilosec in response to plaintiff's complaint of irritation in the upper GI. Tr. 287. No subsequent progress notes mention any GI or GERD problems.

Finally, in regard to plaintiff's anxiety and panic disorder, Dr. Allen noted on April 16, 2002, when he first started treating plaintiff, that plaintiff reported that his panic attacks were better while taking BuSpar. Tr. 237. On May 15, 2003, Dr. Allen noted plaintiff's history of panic attacks and commented that the only recent event was driving over a high bridge. Tr. 212. On May 7, 2004, Dr. Allen remarked that plaintiff's panic disorder was "doing OK" on his current medication. Tr. 249.

II.  Plaintiff's Testimony

Plaintiff testified at the hearing that at the time he quit his job, he worked three eight-hour days per week. Tr. 326. He explained that he began the job with a five day per week schedule,

11 - OPINION & ORDER

1  but reduced his number of days per week because of his headaches.
2  Tr. 328.

3      Plaintiff stated that he began experiencing headaches in 1980
4  or 1981. Tr. 331. They have gotten progressively worse. Id. He
5  thought he was able to sustain work in the Coast Guard even with
6  the headaches because he was younger and was able to "deal with it"
7  better. Id. He also rested during every lunch break for one hour.
8  Tr. 331-32.

9      Being upright brings on his pain. Tr. 332-33. The pain
10 becomes worse with exertion. Tr. 333. At the time of the hearing,
11 plaintiff regularly took morphine for the pain. Id.

12     Because of the headache pain, plaintiff spends a lot of time
13 sitting in front of the television as a means of distraction. Tr.
14 334. If his headache gets severe, he lies down for an hour or two.
15 Id. This occurs on average, five out of every seven days. Id. He
16 sleeps approximately twelve hours per night. Id. He tries to
17 sleep this much because getting out of bed in the morning causes
18 his headache pain to start. Tr. 335. The headaches have been at
19 this level of intensity for the four or five years preceding the
20 hearing. Id.

21     Plaintiff explained that the headaches interfere with his
22 ability to perform even a desk-type job because it impairs his
23 ability to concentrate. Tr. 337. When his head starts to hurt, it
24 makes his mind go "blank," and he loses concentration. Id. He
25 cannot focus 100 percent on what he is doing because he gets
26 sidetracked by the headache. Id. This also makes him scared to
27 drive. Id. Plaintiff also described that the medication he takes
28 for the pain makes him drowsy during the day. Tr. 337.

12 - OPINION & ORDER

1    As for his anxiety and panic attacks, plaintiff believes they
2    were triggered by an auto accident he had several years ago. Tr.
3    338. He stated that he still gets them in certain situations such
4    as narrow roads with no shoulders or passing semi-trucks on narrow
5    roads. Id. He indicated, however, that the medication he takes
6    for this has helped quite a bit. Id. At the time of the hearing,
7    he experienced such panic attacks whenever he drove to California,
8    which he indicated was not often. Tr. 338-39.

9    Plaintiff also described anxiety related to crowds where he
10   feels like he is trapped. Tr. 339. He feels unable to protect
11   himself from danger in places like shopping malls, to the point of
12   panic. Tr. 340. He gets short of breath and feels as if he is
13   going to collapse. Id. As a result, he does not go out and has
14   limited social contacts. Id.

15   Plaintiff testified that he had given up boating, sailing, and
16   motorcycle riding because of his headache pain. Tr. 341. He
17   described a typical day as getting up at 10:00 a.m., having a cup
18   of coffee while watching news for about one hour, going out to the
19   yard to put food in the deer bowl for the deer, "diddling" around
20   the yard, and occasionally going out in the property to clean some
21   brush and then returning to sit. Tr. 342.

22   On the days when he does clear brush, he uses a tractor rather
23   than doing it by hand, and spends an hour or two doing it. Id. He
24   also spends some time cutting up firewood, using a wood splitter,
25   and up to about an hour at a time. Tr. 343. After spending one to
26   two hours outside, he goes inside, empties out the fireplace, and
27   starts to watch television again. Tr. 343. He does this sitting
28   with his feet up, and sometimes lying down. Id.

13 - OPINION & ORDER

1      If his head is hurting, he does not go out.  Tr. 342.

2  Instead, he stays inside and watches television.  Id.

3      Plaintiff estimated that the number of days when he feels well

4  enough to attempt this work outside varies from week to week.  Tr.

5  343.

6  III.  Lay Witness Testimony

7      Plaintiff's wife Victoria Hurst testified at the hearing.  She

8  has been married to plaintiff for eighteen years and stated that

9  plaintiff had headaches when she first met him, although they have

10  gotten worse over the years.  Tr. 346.  In her opinion, the

11  headaches became very bad sometime between June and December 2001.

12  Id.  She noted that at that time, it became harder and harder for

13  plaintiff to go to work and he was almost in tears from the pain.

14  Tr. 347.

15      Before this time, plaintiff would help around the house after

16  work with chores such as preparing dinner or shopping.  Id.  When

17  the headaches became more severe, plaintiff was no longer able to

18  do anything once he got home from work.  Id.  In Victoria Hurst's

19  opinion, plaintiff's inability to get up in the mornings is what

20  led to his finally giving up work.  Id.  Victoria Hurst described

21  plaintiff as having given up activities of boating and camping

22  because of headaches.  Tr. 348.

23      As for plaintiff's panic attacks, Victoria Hurst testified

24  that the first time she observed plaintiff having one was probably

25  in 2001 when she convinced plaintiff to go out to dinner, even

26  though he did not want to.  Tr. 349.  They were in a restaurant in

27  a corner with tables all around them and plaintiff became pale and

28  shaky and finally needed to leave without eating.  Id.  She stated

14 - OPINION & ORDER

that this also happens when plaintiff drives.   Tr. 350.   She further stated that he was reluctant to go anywhere other than his aunt and uncle's house in Merlin, Oregon.   Id.

Victoria Hurst was able to estimate that plaintiff had an average of two to three days per week where plaintiff is productive for one to two hours and then spends the rest of the time sitting on the couch in front of the television.   Tr. 353.   These were his "good" days.   Id.   She also noted that although the Vicodin he previously took for pain "tore his stomach up," he was more alert on that medication and able to hold a conversation compared with the effect of the morphine.   Tr. 354.

IV.  Vocational Expert Testimony

Vocational Expert (VE) Lynn Jones testified at the hearing. Tr. 355-60.   Jones first clarified the nature of plaintiff's past work, determining that the job plaintiff had described as an assistant harbormaster was actually closer to the position of dockhand.   Tr. 355-56.   Thus, he testified that plaintiff's past relevant work was as a boatswain's mate and a dockhand.   Tr. 357.

The ALJ then posed the following hypothetical to the VE:   a forty-nine year old individual with a high school education and work as described by the VE.   Tr. 357.   The person is limited from lifting and carrying more than ten pounds frequently, with an occasional twenty-pound maximum.   Id.   The person should not climb ladders or ropes, or work on scaffolds, and is limited to occasionally balancing and stooping.   Id.   He is also limited from frequent overhead reaching.   Id.   He should avoid hazards and is limited to occasional driving on the freeway or over narrow bridges or in heavy traffic.   Id.   He has difficulty working around crowds

15 - OPINION & ORDER

1 and in tolerating jarring as in a small boat or on a motorcycle.
2 Tr. 358.

3    In response, the VE testified that such a person could not
4 perform plaintiff's past relevant work.  Id.  But, he testified,
5 the person could perform the jobs of table worker, small products
6 assembler, and a hand stepper in small items.  Id.  In response to
7 an additional question by the ALJ, the VE testified that if an
8 individual is going to miss work on a chronic basis of more than
9 one to two days per month, the person would not be competitively
10 employable, especially for positions such as those identified by
11 the VE where there is a large workforce to draw from.  Id.

12    Plaintiff's counsel asked several follow up questions.  In
13 response to those questions, the VE testified that the majority of
14 the positions in the job categories identified, would be in
15 metropolitan rather than rural areas, and he did not know what
16 percentage of those jobs would be located in metropolitan areas
17 with freeways and heavy traffic.  Tr. 359.  The VE noted that
18 taking some kind of "metro" system would expose the person to
19 crowds.  Tr. 359-60.

20                        THE ALJ'S DECISION

21    The ALJ found that plaintiff had not engaged in substantial
22 gainful activity since his alleged onset date.  Tr. 13, 17.  The
23 ALJ then determined that plaintiff's impairments of chronic mixed
24 headache disorder, status post head trauma, his history of left
25 clavicle fracture, his history of left shoulder impingement
26 syndrome, status post surgery in January 2000, his left knee
27 degenerative joint disease, tendonitis, and his history of panic
28 and agoraphobia, were collectively severe impairments.  Id..

16 - OPINION & ORDER

1    However, he found that none of plaintiff's impairments, or
2    combination of impairments, met or equaled a listed impairment.
3    Tr. 13-14, 17.

4        Next, the ALJ determined plaintiff's residual functional
5    capacity.  Tr. 14.  He determined that plaintiff was limited from
6    lifting and carrying more than ten pounds frequently with an
7    occasional twenty-pound maximum.  Tr. 16.  He could not climb
8    ladders or ropes or work on scaffolds.  Id.  He was limited to
9    occasionally balancing and stooping and has a limited capacity for
10   reaching in that he should not be reaching frequently overhead.
11   Id.  He should avoid hazards.  Id.  The ALJ also found that
12   plaintiff was limited to occasionally driving on the freeway, on
13   narrow bridges, or in heavy traffic.  Id.  He found that plaintiff
14   had difficulty working around crowds and tolerating jarring as in
15   a small boat or motorcycle.  Id.

16       Based on this assessment, and on the VE's testimony, the ALJ
17   found that plaintiff was unable to perform his past relevant work,
18   but that he could perform work existing in significant numbers in
19   the economy such as table worker, small products assembler, and
20   hand stuffer.  Tr. 16-17.  Thus, the ALJ concluded that plaintiff
21   was not disabled.  Tr. 17.

22               STANDARD OF REVIEW & SEQUENTIAL EVALUATION

23       A claimant is disabled if unable to "engage in any substantial
24   gainful activity by reason of any medically determinable physical
25   or mental impairment which . . . has lasted or can be expected to
26   last for a continuous period of not less than 12 months[.]"  42
27   U.S.C. § 423(d)(1)(A).  Disability claims are evaluated according
28   to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395

17 - OPINION & ORDER

1  (9th Cir. 1991).    The claimant bears the burden of proving

2  disability.    Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.

3  1989).    First, the Commissioner determines whether a claimant is

4  engaged in "substantial gainful activity."  If so, the claimant is

5  not disabled.    Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20

6  C.F.R. §§ 404.1520(b), 416.920(b).    In step two, the Commissioner

7  determines whether the claimant has a "medically severe impairment

8  or combination of impairments."  Yuckert, 482 U.S. at 140-41; see

9  20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not

10  disabled.

11      In step three, the Commissioner determines whether the

12  impairment meets or equals "one of a number of listed impairments

13  that the [Commissioner] acknowledges are so severe as to preclude

14  substantial gainful activity."  Yuckert, 482 U.S. at 141; see 20

15  C.F.R. §§ 404.1520(d), 416.920(d).    If so, the claimant is

16  conclusively presumed disabled; if not, the Commissioner proceeds

17  to step four.  Yuckert, 482 U.S. at 141.

18      In step four the Commissioner determines whether the claimant

19  can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e),

20  416.920(e).  If the claimant can, he is not disabled.  If he cannot

21  perform past relevant work, the burden shifts to the Commissioner.

22  In step five, the Commissioner must establish that the claimant can

23  perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§

24  404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its

25  burden and proves that the claimant is able to perform other work

26  which exists in the national economy, he is not disabled.    20

27  C.F.R. §§ 404.1566, 416.966.

28      The court may set aside the Commissioner's denial of benefits

18 - OPINION & ORDER

1   only when the Commissioner's findings are based on legal error or
2   are not supported by substantial evidence in the record as a whole.
3   Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a
4   mere scintilla," but "less than a preponderance."  Id.  It means
5   such relevant evidence as a reasonable mind might accept as
6   adequate to support a conclusion.  Id.

7                             DISCUSSION

8        Plaintiff contends that the ALJ erred by finding that
9   plaintiff's impairments did not meet or equal a listed impairment,
10  by finding plaintiff's testimony not credible, by finding the
11  testimony of plaintiff's spouse not credible, and by failing to
12  give proper weight to the VE's opinion.  I address plaintiff's
13  arguments in turn.

14  I.  Listed Impairment

15       At step three of the sequential analysis, the ALJ determines
16  whether the impairment meets or equals an impairment listed by the
17  Commissioner.  20 C.F.R. §§ 404.1520(d); 20 C.F.R. pt. 404, subpt.
18  P, App. 1.  If the claimant is found to either meet or equal the
19  severity and durational requirements for the applicable listed
20  impairment, he is found presumptively disabled without
21  consideration of his age, education, and work experience.  Young v.
22  Sullivan, 911 F.2d 180, 183 (9th Cir. 1990).  An ALJ is required to
23  evaluate the relevant evidence before concluding that a claimant's
24  impairments do not meet or equal a listed impairment.  Lewis v.
25  Apfel, 236 F.3d 503, 512 (9th Cir. 2001).

26       In this case, as noted above, the ALJ determined that
27  plaintiff's impairments did not meet or equal a listed impairment.
28  The ALJ noted plaintiff's history of panic and agoraphobia.  Tr.

19 - OPINION & ORDER

13, 17.  Specifically in regard to plaintiff's anxiety disorder, the ALJ noted that plaintiff reported having panic attacks while driving, particularly on freeways or busy highways, and that he now alleged that these symptoms extended to other public venues, such as fear of crowds at the grocery store or shopping mall.  Tr. 14. The ALJ noted that plaintiff received treatment for his anxiety throughout 2001, but was nonetheless able to commute back and forth independently at that time.  Tr. 15.

The ALJ remarked that after moving to Oregon in early 2002, plaintiff received treatment from the VA in White City, Oregon and his anxiety and other mental symptoms appeared to have gone into remission almost entirely.  Id.  The ALJ noted that in October 2002, plaintiff specifically denied that he had ruminations about past traumatic stress, social avoidance or isolation, hypervigilance, or depression.  Id.

The ALJ stated that plaintiff's records from the White City VA showed that before September 2003, the month plaintiff filed his disability application, plaintiff had ongoing chronic headaches, but no significant recurrence of panic or other mental symptoms. Id.  Finally, the ALJ explained that plaintiff's expression of symptoms in October 2004 of recurrent panic attacks, morbid depression causing up to twelve hours of sleep per night, diminished concentration, intolerance of crowds, and difficulty leaving the house, were in contrast to the records of the previous three years, during which his complaints did not reveal serious mental problems.  Tr. 15-16.  Moreover, the ALJ explained, plaintiff's anxiety symptoms had responded well to treatment in the past.  Tr. 16.

20 - OPINION & ORDER

1    Plaintiff argues that the ALJ should have found that his

2  anxiety disorder and agoraphobia met Listing 12.06 which governs

3  anxiety related disorders.   It provides, in pertinent part, as

4  follows:

5          In these disorders anxiety is either the predominant
           disturbance or it is experienced if the individual
6          attempts to master symptoms; for example, confronting the
           dreaded object or situation in a phobic disorder or
7          resisting the obsessions or compulsions in obsessive
           compulsive disorders.

8
           The required level of severity for these disorders
9          is met when the requirements in both A and B are
           satisfied, . . .

10
           A.  Medically documented findings of at least one of
11         the following:

12             . . .

13             2.  A persistent irrational fear of a specific
           object, activity, or situation which results in a
14         compelling desire to avoid the dreaded object, activity,
           or situation; or

15
               . . .
16
           AND
17
           B.  Resulting in at least two of the following:
18
           1.  Marked restriction of activities of daily living; or
19
           2.   Marked difficulties in maintaining social
20         functioning; or

21         3.  Marked difficulties in maintaining concentration,
           persistence, or pace; or
22
           4.  Repeated episodes of decompensation, each of extended
23         duration. . . . .

24  20 C.F.R. pt. 404, subpt. P, App. 1, Listing 12.06.

25    Plaintiff argues the evidence shows, under the "A" criteria,

26  that he has a "persistent irrational fear of a specific object,

27  activity or situation which results in a compelling desire to avoid

28  the dreaded object, activity, or situation."   He notes that

21 - OPINION & ORDER

multiple physicians have diagnosed him as suffering from anxiety or panic attacks with agoraphobia and he has been prescribed BuSpar for the disorder since at least April 2002. He contends that the record reflects his persistent fear while driving on the freeway and while crossing bridges, including while driving to the hearing before the ALJ. Additionally, he argues that the record shows that he experiences panic attacks around "lots of people," such that he avoids going to stores and just stays at home.

As to the "B" criteria, plaintiff argues that he meets two of the four criteria. He contends that both the medical documentation and the hearing testimony establish that he has marked restrictions of daily living and marked difficulties in maintaining social functioning. His disorder prevents him from driving an automobile on a consistent and routine basis and he avoids any locale where crowds of people may be encountered, including the grocery store and malls. His attempt to eat at a restaurant for dinner with his wife failed and he has no social life other than visiting his aunt and uncle who live nearby.

In response, defendant argues that plaintiff failed to establish that he met the "B" criteria. Defendant contends that the uncontroverted evidence indicates that the "B" criteria of functional losses were all rated "mild."

Defendant notes that plaintiff's mental status examinations established only mild impairment, with GAF ratings from 63 to 75. Defendant also notes that even when he complained of serious psychiatric symptoms, his GAF was rated at 60, on the border between moderate and mild symptoms. Thus, defendant argues, plaintiff failed to establish that any functional limitations

22 - OPINION & ORDER

1   caused by his anxiety or panic disorder and agoraphobia, are of a
2   "marked" level.

3      I agree with defendant.  First, none of the treating medical
4   records supports a finding of marked impairment as required by the
5   "B" criteria.  While there is no dispute that plaintiff suffers
6   from an anxiety or panic disorder with agoraphobia which has been
7   consistently treated with BuSpar since at least 2002, there is no
8   indication from the treating physician and other treating providers
9   that the disorder has caused a marked limitation in functioning.

10      In 2001, Dr. Dang first noted plaintiff's self-reported
11   fifteen year history of anxiety while driving on the freeway.  Tr.
12   187.  Plaintiff reported needing to take Xanax to drive on the
13   freeway.  Id.  As the ALJ noted, however, plaintiff was still able
14   to commute to and from his job at the time.  Dr. Dang referred
15   plaintiff for a mental health assessment.  Id.

16      In June 2001, Dr. Hargrave evaluated plaintiff and noted his
17   report of panic attacks and agoraphobia.  Tr. 178.  She prescribed
18   BuSpar which plaintiff has taken ever since.  Id.  During 2001,
19   plaintiff worked with Debra Nathanson and Reenie Davison regarding
20   techniques to control his anxiety.  The medical records indicate
21   that his anxiety decreased.  E.g., Tr. 168-69 (August 9, 2001
22   report to Nathanson that anxiety had decreased), 166 (August 9,
23   2001 report to Dr. Hargrave that panic attacks decreased in
24   severity and frequency and had resumed driving on freeway); 165
25   (report to Davison of no significant panic attacks since last visit
26   in September when had reported an increase); 159 (November 30, 2001
27   report to Dr. Hargrave that anxiety and agoraphobia improved); 157
28   (April 2002 report by Nathanson stating that plaintiff had

23 - OPINION & ORDER

completed relaxation and stress management with Davison with a good response and had benefitted from medication; Nathanson assesses GAF of 75).

During his care provided by Dr. Allen in White City, the reports indicate that in 2002, plaintiff's panic attacks were better on Buspar, that in 2003, plaintiff had only one recent panic attack event while driving over a high bridge, that in 2004, his panic disorder was "doing OK" on his current medication, and that in late October 2004, he stated that BuSpar helped his driving anxiety. Tr. 212, 237, 249, 310-11. Even at that late October 2004 evaluation with a psychiatric mental health nurse practitioner when plaintiff reported symptoms of agoraphobia, the nurse practitioner assessed a GAF of 60. Id.

Second, the other medical evidence in the record supports the ALJ's determination that plaintiff's functional impairments as a result of the anxiety disorder are not marked. A February 27, 2004 Psychiatric Review Technique Form completed by Developmental Disability Services psychologist Robert Henry, Ph.D., noted plaintiff's anxiety-related disorder by history, but found none was alleged currently. Tr. 263. He also found that plaintiff's generalized anxiety disorder was in remission. Tr. 268. He rated all of plaintiff's limitations as mild. Tr. 273.

Finally, as discussed below, the ALJ did not err in rejecting plaintiff's and his wife's subjective testimony. Thus, he did not need to credit their testimony regarding the extent of the symptoms as described by them at the hearing. Thus, the ALJ did not err in concluding that plaintiff's anxiety-related impairment did not meet or equal Listing 12.06.

24 - OPINION & ORDER

II.  Plaintiff's Testimony

The ALJ is responsible for determining credibility.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  When determining the credibility of a plaintiff's complaints of pain, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain when determining whether a claimant's complaints of pain are exaggerated.  <u>Id.</u>

Here, the ALJ first noted that although plaintiff claimed to have quit work because of the combined effects of chronic headaches and anxiety, plaintiff did not file a DIB claim for almost another two years.  Tr. 14.  The ALJ also remarked that the medical records from the two-year time period immediately after he stopped working showed that plaintiff's headaches appeared to have remained at about the same level of severity as they were before he stopped working.  <u>Id.</u> While this observation does not directly demonstrate that the severity level of plaintiff's headaches was or was not disabling during this time period, it is a reasonable observation regarding plaintiff's credibility, or lack thereof, regarding his

25 - OPINION & ORDER

statements that working increased his pain.

The ALJ noted what he considered to be various contradictions between the plaintiff's testimony and his medical records. He stated that the records from the VA in Sacramento showed that plaintiff was able to manage his headaches while working in late 2001. Id. He noted that although at his hearing, plaintiff said he had not used marijuana "for some years," because such use would create a risk to his continued receipt of a Coast Guard pension, the record showed that in April 2001, he acknowledged regular use of marijuana, even after he had retired from the Coast Guard. Tr. 14-15. The ALJ also noted two separate entries in the medical records suggesting that plaintiff's retirement had been planned for several months, contradicting his assertion that he stopped work because of pain and anxiety. Tr. 15.

The ALJ then noted that despite plaintiff's claim of anxiety related to driving in traffic, he continued commuting back and forth to work while living in California. Tr. 15. He also noted that after moving to Oregon, plaintiff's medical records suggested that his anxiety had "gone into remission almost entirely." Id.

The ALJ suggested that plaintiff's level of activity as noted in the medical records belied his testimony at the hearing. For example, the ALJ stated, in March 2003, his provider reported that he had been lifting weights with good results. Id. In May 2003, he reported spending a number of six-hour days climbing and pruning trees and weed eating his property. Id. The ALJ also remarked that plaintiff reported improvement with the use of narcotics to treat his headache pain, beginning in January 2004. Id.

Finally, the ALJ explained that plaintiff's report, in October

26 - OPINION & ORDER

20, 2004, of an increase in panic attacks and depressive symptoms causing him to sleep twelve hours per day, and of diminished concentration and difficulty in leaving his house, stood in "striking contrast" to the VA medical records from the preceding three years, during which his mental health problems were not serious.  Tr. 16.  The ALJ noted that only one month earlier, plaintiff had reported only mild depressive symptoms to Dr. Allen. Id.

The ALJ considered the disparity between the reported October 20, 2004 psychiatric complaints and those previously stated, and opined that plaintiff might have overstated his mental complaints in October 2004 due to the prospect of deriving secondary gain. Id.  The ALJ noted that plaintiff had recently hired an attorney to assist with his DIB claim, and the December 8, 2004 hearing date was approaching.  Id.  The ALJ also remarked that in the past, plaintiff's anxiety and depressive symptoms had responded to treatment and that even if his symptoms as described in October 2004, were valid, it was likely they would again respond to treatment and would not likely impose significant vocational limitations for a continuous period of twelve months or longer. Id.

The ALJ concluded that testimony provided by plaintiff was contradicted in the written record on several points.  Thus, the ALJ determined that plaintiff's statements were not fully credible. Id.  The ALJ afforded only partial credence to the exertional and nonexertional limitations implicit in plaintiff's testimony.  Id.

Plaintiff first argues that his 2001 medical record shows that he had reported past use, that is, that he had smoked marijuana for

27 - OPINION & ORDER

1  pain and thus, this does not contradict his hearing testimony that

2  he had smoked marijuana in the remote past.

3      I disagree with plaintiff. The chart note plaintiff refers to

4  in his memorandum is at page 184 and is an April 17, 2001 entry by

5  Nathanson. Tr. 184. Under a section entitled "Substance Abuse,"

6  Nathanson wrote: "pt reports smoking marijuana prn for pain[.]"

7  Id. Next, she wrote that plaintiff "denies etoh, stating that the

8  last drink was 3yr ago. . . ." Id. It was not error for the ALJ

9  to read the notation by Nathanson regarding plaintiff's marijuana

10 use as a report by plaintiff of his current use, not his past use.

11 Given the next notation regarding his alcohol use where plaintiff

12 clearly articulated that it was a past habit, the lack of any

13 express indication that the marijuana use was a past habit renders

14 the ALJ's interpretation of the note as suggesting a current habit,

15 a reasonable interpretation of the evidence and thus, a reasonable

16 basis upon which to compare the evidence to plaintiff's

17 contradictory hearing testimony.

18     Moreover, a June 12, 2001 progress note by Dr. Hargrave

19 expressly states "[d]aily marijuana use for headache." Tr. 178.

20 This also is reasonably understood as plaintiff's report of

21 current, not past, use. See also Tr. 188 (March 6, 2001 note by

22 Dr. Dang of "marijuana daily to help HA); 181 (Nathanson listed

23 "cannabis use" under diagnosis impressions).

24     Next, plaintiff argues that the ALJ erred in rejecting his

25 testimony regarding plaintiff's fear of crowds at places such as

26 grocery stores and shopping malls. Plaintiff argues that there is

27 no support for the ALJ's suggestion that plaintiff fabricated these

28 symptoms.

28 - OPINION & ORDER

The ALJ stated that plaintiff "reported having panic attacks while driving, particularly on freeways or busy highways. However, now he alleges these symptoms also extend to other public venues, such as fear of crowds at the grocery store or shopping mall." Tr. 14. This statement by the ALJ appears in the portion of his decision summarizing plaintiff's testimony and before his conclusion that plaintiff's testimony was not fully credible and was contradicted in the record. See id. I do not read the decision as rejecting plaintiff's testimony because his complaints of anxiety and panic expanded from a specific situation regarding driving to a fear of crowds at stores or malls.

Rather, the ALJ relied principally on the contradiction between plaintiff's testimony and the medical records, as well as on the contradiction between plaintiff's testimony and some of his daily activities (such as six-hour days climbing and pruning trees and weed eating his property), and ordinary techniques of credibility assessment such as an inconsistency between plaintiff's testimony about his reason for quitting work in December 2001 and the medical records which note his planned retirement for that date months in advance, to reject plaintiff's subjective testimony.

And, while plaintiff argues that the ALJ improperly rejected his claim of anxiety disorder, the ALJ did not do so. The ALJ accepted the disorder as one of plaintiff's impairments but determined that the severity of the limitations plaintiff described as being caused by that disorder were not fully credible.

The ALJ listed plaintiff's history of panic and agoraphobia as one of plaintiff's impairments giving rise to his combination of impairments which the ALJ concluded were severe. Tr. 13. The ALJ

29 - OPINION & ORDER

1  did not dispute the multiple references in the record to
2  plaintiff's anxiety or panic attacks with agoraphobia.  But, the
3  ALJ noted that plaintiff's anxiety disorder appeared well
4  controlled with medication.  This was not error.  Tr. 15 (record
5  shows that anxiety and mental symptoms have gone into remission
6  almost entirely), 16 (anxiety symptoms had responded well to
7  treatment).

8       The ALJ's rejection of plaintiff's testimony was not in error.
9  The ALJ articulated clear and convincing reasons in support of his
10 determination, and those reasons are supported by substantial
11 evidence in the record.

12 III.  Lay Witness Testimony

13      As a lay witness, plaintiff's wife is not competent to testify
14 to medical diagnoses, but she is competent to testify as to
15 plaintiff's symptoms or how an impairment affects his ability to
16 work.  Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  The
17 ALJ may disregard a lay witness's testimony by offering reasons
18 germane to the witness.  Dodrill v. Shalala, 12 F.3d 915, 919 (9th
19 Cir. 1993).

20      The ALJ stated that plaintiff's wife provided testimony that
21 essentially supported plaintiff's statements.  Tr. 14.  He noted
22 that she described plaintiff as very inactive, "at times appearing
23 as though in semi-vegetative stupor due to pain, depression, and
24 narcotic medication used to control pain."  Id.  The ALJ then
25 rejected plaintiff's wife's testimony as not fully credible and
26 contradicted in the record at various points.  Id.

27      The ALJ relied on the same reasons he supplied in support of
28 his rejection of plaintiff's testimony, as support for his
   30 - OPINION & ORDER

1   rejection of plaintiff's wife's testimony.  Tr. 14-16.  Plaintiff

2   argues this was error because the ALJ made no effort to

3   independently evaluate plaintiff's wife's testimony.

4       Plaintiff contends that Social Security Ruling (SSR) 96-7p

5   (found at 1996 WL 374186), requires the ALJ to articulate specific

6   reasons for the finding on credibility, including the weight given

7   to the individual's statements and the reason for that weight.

8   Plaintiff argues that the ALJ did not meet that standard here in

9   his conclusory dismissal of plaintiff's wife's testimony.

10      Although plaintiff does not misrepresent what SSR 96-7p

11  states, the ruling has no application to the evaluation of a lay

12  witness's testimony.  Rather, it is concerned with the assessment

13  of the credibility of the claimant's own statements, not those

14  offered by family members or friends.  As noted above, the ALJ must

15  only articulate reasons germane to the witness in support of a

16  rejection of lay witness testimony.  Here, the ALJ's reasons,

17  paralleling those given for the rejection of plaintiff's testimony,

18  include that plaintiff's wife's testimony was inconsistent with the

19  medical records and inconsistent with plaintiff's daily activities.

20  These are bases germane to the testimony.  The ALJ did not err in

21  rejecting plaintiff's wife's testimony.

22  IV.  VE Opinion

23      Plaintiff argues that the ALJ failed to give proper weight to

24  the opinion of the VE.  Plaintiff contends that the ALJ improperly

25  ignored the VE's testimony that a person with chronic absenteeism

26  of more than one to two days per month is not competitively

27  employable.  Because, however, the ALJ did not err in rejecting

28  some or all of plaintiff's subjective testimony, and the remaining

31 - OPINION & ORDER

1  portions of the record did not support a claim of excessive

2  absenteeism, the ALJ did not err in failing to credit that part of

3  the VE's testimony.

4      Finally, plaintiff suggests that the ALJ "failed to posit to

5  the [VE] a hypothetical individual who possessed the combination of

6  impairments that the Plaintiff has been found to have in the record

7  and confirmed by the ALJ's own findings." Pltf Mem. at p. 13.  I

8  disagree.  The ALJ does not present a list of impairments to the

9  VE.  Rather, the ALJ presents a list of vocationally-related

10 functional limitations that the evidence supports as being caused

11 by the claimant's severe impairments. E.g., Roberts v. Shalala, 66

12 F.3d 179, 184 (9th Cir. 1995) (ALJ may meet burden under step five

13 by propounding to a VE a hypothetical that is supported by

14 substantial evidence in the record and that reflects all the

15 claimant's limitations); Magallanes v. Bowen, 881 F.2d 747, 756

16 (9th Cir. 1989) (ALJ posing a hypothetical question to a VE "must

17 set out all the limitations and restrictions of the particular

18 claimant" but need not include all claimed impairments in his

19 hypotheticals) (internal quotation and emphasis omitted).  The ALJ

20 did not err by failing to present the VE a list of plaintiff's

21 impairments.

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

32 - OPINION & ORDER

1                            CONCLUSION

2        The decision of the Commissioner is affirmed and this case is

3   dismissed.

4        IT IS SO ORDERED.

5                    Dated this __26th__ day of __May_____, 2006.

6

7

8                              ___/s/ Dennis James Hubel_____
                               Dennis James Hubel
9   _____ United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33 - OPINION & ORDER